AETNA CASUALTY & SURETY COMPANY v RALPH WILSON
PLASTICS COMPANY

Docket No. 139812. Submitted August 3, 1993, at Grand Rapids.
 Decided September 14, 1993; approved for publication December 1, 1993, at 9:05 A.M.

Aetna Casualty & Surety Company, as subrogee of National Seating Company, brought a products liability action in the Macomb Circuit Court against Ralph Wilson Plastics Company and Plywood-Detroit, Inc., following an industrial fire caused by the use of a glue solvent manufactured by Wilson and sold by Plywood-Detroit. The fire started when an employee of National Seating used a piece of foam rubber to soak up some spilled glue solvent, and a spark of static electricity from the foam rubber ignited the solvent. The court, Robert J. Chrzanowski, J., granted summary disposition for the defendants, finding that they had provided adequate warnings about the risk of fire and, therefore, the plaintiff could not show probable cause. The plaintiff appealed.

The Court of Appeals *held:*

1. The prominent warning provided by the defendants that the product was flammable and that either open flame or sparks could cause it to ignite was adequate.

2. The sophisticated user or knowledgeable user doctrine applies to National Seating, a bulk user of the glue solvent. National Seating and its management must be charged as a matter of law with sufficient expertise to have knowledge of how to use the product in a safe manner.

3. The contention by the plaintiff that National Seating would not have used the solvent had it appreciated the flammability hazard from static electricity is belied by the defendants' uncontradicted affidavit indicating that National Seating continued to use the solvent for almost four years after the fire. The requisite proximate cause between the asserted inadequacy

REFERENCES

Am Jur 2d, Products Liability §§ 329, 341, 344, 345.
Manufacturer's or seller's duty to give warning regarding product as affecting his liability for product-caused injury. 76 ALR2d 9.
Products liability: glue and other adhesive products. 7 ALR4th 155.

of the defendant's warnings and the plaintiff's damage is lacking.

Affirmed.

CONNOR, J., dissenting, stated that the adequacy of the warnings that the defendants supplied is a question for the trier of fact to decide.

1. PRODUCTS LIABILITY — WARNINGS OF FLAMMABILITY.

A prominent warning that a product is flammable and that either open flame or sparks can cause it to ignite is adequate to warn even unsophisticated users of the product that such sources of combustion must be kept from the vicinity of the product; it is not necessary to list the means by which a spark could be generated.

2. PRODUCTS LIABILITY — SOPHISTICATED USERS — CHEMICAL PRODUCTS.

A commercial enterprise that uses materials in bulk must be regarded as a sophisticated user of the material as a matter of law; those with a legal obligation to be informed concerning the hazards of materials used in manufacturing processes must be relied upon, as sophisticated users, to fulfill their legal obligations, thereby absolving manufacturers in some circumstances of the duty to warn those who use chemical products in the course of their employment for a sophisticated bulk user.

*Collins, Einhorn & Farrell, P.C.* (by *Theresa M. Asoklis* and *Noreen L. Slank*), for the plaintiff.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Robert S. Krause* and *Brian K. Zahra*), for the defendants.

Before: FITZGERALD, P.J., and CONNOR and TAYLOR, JJ.

PER CURIAM. Plaintiff appeals as of right an order granting defendants' motion for summary disposition pursuant to MCR 2.116(C)(10) in this products liability action arising out of an industrial fire caused by the use of a glue solvent.

Plaintiff, as subrogee, brought this action against the manufacturer of the glue solvent,

Ralph Wilson Plastics Company (RWPC), and the seller, Plywood-Detroit, Inc. (PDI), alleging negligence and breach of implied warranty based on defendants' failure to warn. Plaintiff is the property and casualty insurer for its subrogor, National Seating Company (NSC).

NSC is a manufacturer of tables and chairs. Foam rubber, glue, and glue solvents are commonly used in NSC's manufacturing process. Beginning in 1980, NSC began purchasing fifty-five-gallon drums of Lokweld 110, a glue solvent, from PDI at intervals of eight to ten weeks. Shortly after NSC began these purchases, PDI provided NSC with the relevant material safety data sheets (MSDS) required by the Occupational Safety and Health Act (MIOSHA), MCL 408.1001 et seq.; MSA 17.50(1) et seq., which NSC, as an employer, was obligated to disseminate to its employees pursuant to MCL 408.1011(c); MSA 17.50(11)(c).

According to the MSDS, Lokweld is a highly flammable, even explosive solvent, with a flash point of ten to fifteen degrees Fahrenheit. Lokweld is to be stored and used only in well-ventilated areas. All electrical equipment is to be explosion proofed, and spills are to be immediately sponged with absorbent rags that must be placed in a closed metal container.

The fifty-five-gallon drums in which Lokweld was sold by PDI carried red and yellow warning labels on the top and sides, proclaiming Lokweld to be a flammable liquid, with a second label announcing "DANGER" in inch-high letters, beneath which were these warnings:

EXTREMELY FLAMMABLE
VAPORS MAY CAUSE FLASH FIRES!
HARMFUL OR FATAL IF SWALLOWED!
TAKE THE FOLLOWING PRECAUTIONS BEFORE REMOVING LID:

DO NOT SMOKE—BE SURE WORK AREA IS WELL VENTI-
LATED—OPEN WINDOWS—EXTINGUISH ALL FLAMES,
PILOT LIGHTS—TURN OFF STOVES, HEATERS, ELECTRIC
MOTORS—READ WARNINGS AND FIRST AID INSTRUC-
TIONS ON SIDE LABELS—POST NUMBER OF DOCTOR OR
POISON CONTROL CENTER AT NEAREST TELEPHONE.

Another label contained the following warnings:

Prevent buildup of vapors—open all windows
and doors—use only with cross ventilation. Keep
away from heat, sparks, and open flame. Do not
smoke, extinguish all flames and pilot lights, and
turn off stoves, heaters, electric motors, and other
sources of ignition during use and until all vapors
are gone. Avoid prolonged contact with skin or
repeated breathing of vapors.
Close container tightly after use. Store in a cool,
well-ventilated area.

Nsc's management was well aware that the
foam rubber used in the chair manufacturing
process is routinely subject to a build up of static
electricity. On May 5, 1987, David Swift, a new,
part-time employee of NSC, used a rag soaked in
Lokweld to clean excess glue from his work table.
Some of the Lokweld spilled on the floor. Swift
used a piece of foam rubber to soak up the solvent.
When Swift picked up the foam rubber, a flash fire
erupted. Nsc sustained extensive property damage,
for which plaintiff reimbursed NSC. Fortunately, no
one was injured. Plaintiff contends, and defendants
do not dispute, that the solvent was ignited by
static electricity.

Plaintiff brought suit in February 1990 contend-
ing that the warnings about the flammability of
Lokweld were inadequate. During the course of
discovery, plaintiff's expert testified in a deposition
that the warning labels on the drums were inade-
quate because they failed to warn of the specific

danger from static electricity. The expert contended that hazard studies and literature in the chemical industry regarding volatile products had recognized fire hazards from static electricity for many years, but that the danger of fire from static electricity is a little-known phenomenon among the lay public. According to the expert, most people would not include static electricity in the term "spark." However, neither the American National Standards Institute nor the Federal Hazardous Substances Act, 15 USC 1261 *et seq.*, distinguish among sparks by virtue of the generating cause. Plaintiff's expert conceded that NSC, having purchased the product for a number of years, was probably experienced in using Lokweld, but noted that long-term use can result in carelessness.

David Swift testified that neither he nor his co-workers were ever given any information about using Lokweld by NSC managers. He could not remember whether warning labels were on the drum but stated that if there were labels, he did not read them. He had never heard of a material safety data sheet, and had never seen any written information about Lokweld. Although he assumed Lokweld to be flammable, and knew that foam rubber is always charged with static electricity, he claimed to have no idea that a static spark could start a fire.

In moving for summary disposition under MCR 2.116(C)(10), a PDI representative submitted a supporting affidavit, asserting that NSC continued to purchase Lokweld through January 1991. Nsc's president and owner stated, in an opposing affidavit, that he had no knowledge of the particular risk from static electricity sparks, and claimed he had never been warned that static electricity could ignite Lokweld. He asserted that NSC had taken precautions against other sources of ignition, and

that if NSC had known of the danger from static electricity, it would not have used Lokweld.

In seeking summary disposition, defendants contended that they owed no duty to warn, because the product was placed in the hands of a sophisticated user; plaintiff contended that its subrogor was not a sophisticated user of the product. Defendants further asserted that, if they had a duty, their warnings were adequate, but even if their warnings were inadequate, plaintiff could not show proximate cause. Defendants noted that NSC had been cited by the Michigan Occupational Safety and Health Administration on February 2, 1987, for failing to provide its employees with information regarding hazardous substances and failing to maintain and make available MSDS records for its employees.

In a written opinion, the circuit court concluded that defendants had a duty to warn, and that the warnings given adequately encompassed the risk. Absent inadequate warnings, the circuit court reasoned that plaintiff could not possibly show proximate cause.

Plaintiff argues that the warnings given by defendants were inadequate as a matter of law because they did not warn of the risk of ignition by static electricity and that the failure to warn was a proximate cause of NSC's damages. We disagree.

If a manufacturer had to list all sources of friction, or all sources of sparks, as a means of warning of a flammability hazard, its warning label would have to be of epic or encyclopedic proportions. Even then, the manufacturer could not be certain that it had covered every possibility. The combinations of circumstances or materials that could create a spark or friction would be almost limitless. This Court has previously recognized that excessive warnings on product labels

may be counterproductive, causing "sensory overload" that literally drowns crucial information in a sea of mind-numbing detail. *Dunn v Lederle Laboratories,* 121 Mich App 73, 81; 328 NW2d 576 (1982).

We agree with defendants that a prominent warning, as here, that a product is flammable, and that either open flame or sparks can cause it to ignite, is adequate for the task of warning even unsophisticated users of the product that such sources of combustion must be kept from the vicinity of the product. To adopt plaintiff's argument would effectively make it impossible to ever adequately warn of flammability hazards in a manner sufficient to avoid liability where, as here, users of a product admit that no label would have sufficed, because the warning label that was provided with the product was ignored. A spark is a spark, and a possible source of ignition of a highly flammable compound, irrespective of the means by which the spark was generated, whether by static electricity or otherwise. Accordingly, as a matter of law, defendant RWPC's warning, which did specify sparks as a potential hazard, was not inadequate. This conclusion makes it unnecessary to determine whether a prominent warning of flammability generally might obviate the need to detail the types of ignition sources, at least in terms of including such obvious causes as flame and sparks.

We are also of the opinion that the "sophisticated user" or "knowledgeable user" doctrine properly applies, in general, to plaintiff's subrogor as a bulk user of Lokweld. Commercial enterprises that use materials in bulk must be regarded as sophisticated users, as a matter of law. *Higgins v E I DuPont de Nemours & Co, Inc,* 671 F Supp 1055, 1058-1059 (D Md, 1987). Thus, the affidavit of the NSC president, wherein he stated that he failed to

appreciate the real nature of the flammability hazard despite defendants' warning labels and material safety data sheets, must be rejected because NSC, and its management, must be charged as a matter of law with sufficient expertise to have knowledge of how to use this product in a safe manner. *Hall v Ashland Oil Co,* 625 F Supp 1515, 1521 (D Conn, 1986).

This is particularly true where, as here, NSC, as the employer, had an obligation under MIOSHA, as it existed before May 25, 1986, to "[m]ake available to employees in a conspicuous location in the area where a chemical substance or mixture which is used in a quantity capable of creating a hazard is being manufactured or mixed in the manufacturing process, a material safety data sheet or other informational sheet or system" that specifies, inter alia, "[t]he flash point, autoignition temperature, . . . and any unusual fire or explosion hazards of the chemical substance or mixture." MCL 408.1011(1)(c)(v); MSA 17.50(11)(1)(c)(v).

Michigan jurisprudence has recognized the sophisticated user doctrine at least since *Antcliff v State Employees Credit Union,* 414 Mich 624; 327 NW2d 814 (1982). The case law is consistent on this point with 2 Restatement Torts, 2d, § 388, comment k, pp 306-307. See *Mascarenas v Union Carbide Corp,* 196 Mich App 240; 492 NW2d 512 (1992). Those with a legal obligation to be informed concerning the hazards of materials used in manufacturing processes must be relied upon, as sophisticated users, to fulfill their legal obligations, thereby absolving manufacturers in some circumstances of the duty to warn the users of chemical products, where such use is in the course of employment for a sophisticated bulk user. Any other rule would mean that " '[m]odern life would be intolerable unless one were permitted to rely to

a certain extent on others' doing what they normally do, particularly if it is their duty to do so.' 2 Restatement Torts, 2d, § 388, comment n, p 308." *Tasca v GTE Products Corp,* 175 Mich App 617, 624; 438 NW2d 625 (1988).

Plaintiff's further contention, that its subrogor would not have used Lokweld had it appreciated the flammability hazard from static electricity, is belied by defendants' uncontradicted affidavit indicating that NSC continued to use Lokweld through January 1991. Regarding the claim that this creates a genuine issue of material fact, a prerequisite for avoiding summary disposition under MCR 2.116(C)(10), whether the discrepancy between NSC's stated intent and its actions is "material," we think it is clearly not "genuine." Summary disposition cannot be avoided by conclusory assertions that are at odds either with prior sworn testimony of a party or, as here, actual historical conduct of a party. *Gamet v Jenks,* 38 Mich App 719, 726; 197 NW2d 160 (1972). Here, NSC's actions after the disastrous episode of May 5, 1987, stand in eloquent contradiction to the affidavit of its president that, had it known of the flammability hazards from static electricity, it would never have used Lokweld. Thus, again, the requisite proximate cause between the asserted inadequacy of defendants' warning and plaintiff's damage is lacking.

Having addressed plaintiff's arguments from every possible perspective, we are forced to conclude that the circuit court correctly granted the motion for summary disposition. Accordingly, the decision of the circuit court is affirmed.

CONNOR, J. *(dissenting).* I agree that, as a sophisticated user, National Seating Company (NSC), had the duty to comply with workplace safety laws and have its employees read and follow all instructions

that defendants supplied about the safe use of Lockweld 110. Therefore, if the information supplied had been adequate to alert someone to the danger posed by sopping up a spill with foam rubber, or if defendants had instructed NSC about a safe method of sopping up spills that would have precluded the use of foam rubber, defendants would not be liable for the damage caused by the fire.

However, under "Precautions for Safe Handling and Use," the material safety data sheet said only:

Spills should be cleaned up immediately. Soak up spill with absorbent material or wipe up with rags. Absorbent material or rags should be put into closed container.

Foam rubber is an "absorbent material." Thus, the fire at NSC started while NSC's employee was acting in accordance with defendants' instructions for safe handling.

The only warning defendants supplied NSC to alert it to the danger that soaking up spills with foam rubber could cause a fire was the label warning to keep the solvent away from sparks. I would hold the adequacy of the warnings defendants supplied to be a question for the trier of fact to decide.[1]

I dissent.

---

[1] I do not find NSC's continued use of the product damning. Defendants have presented no evidence showing that NSC continues to use foam rubber to sop up spills.