Ralph NEWSON, Plaintiff,

v.

MONSANTO COMPANY, a foreign corporation qualified to do business in Michigan; E.I. DuPont de Nemours & Company, Inc.; a Delaware corporation qualified to do business in Michigan; Sekisui American Corporation, a business in Michigan; jointly and severally, Defendants.

Clyde ENOCHS, Plaintiff,

v.

MONSANTO COMPANY, a foreign corporation qualified to do business in Michigan; E.I. DuPont de Nemours & Company, Inc.; a Delaware corporation qualified to do business in Michigan; Sekisui American Corporation, a business in Michigan; jointly and severally, Defendants.

Cole BRUNO, Plaintiff,

v.

MONSANTO COMPANY, a foreign corporation qualified to do business in Michigan; E.I. DuPont de Nemours & Company, Inc.; a Delaware corporation qualified to do business in Michigan; Sekisui American Corporation, a business in Michigan; jointly and severally, Defendants.

Nos. 93–71259, 93–71275 and 94–70145.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 1, 1994.

Alan B. Posner, Detroit, MI, for plaintiff.

Kathleen A. Lang, Detroit, MI, Norbert B. Leonard, Troy, MI, Hans Massaquoi, Detroit, MI, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This matter has come before the Court on Defendant Monsanto Plastics and Resin

Company's motions for summary judgment. Defendants E.I. duPont DeNemours & Company and Sekisui American Corporation joined Monsanto's motions. Plaintiffs Clyde Enochs, Ralph Newson, and Cole Bruno filed separate complaints, all of which have been consolidated. For the foregoing reasons, the court hereby grants Defendants' motions.

## I. Background

Plaintiffs are former employees of Ford Motor Company who claim to suffer respiratory injury or disease from working at Ford's Dearborn Glass Plant, where they manufactured automobile windshields. Enochs worked at the Dearborn Glass Plant from 1969 until April 17, 1991. Newson worked there from 1979 until March 31, 1989. Bruno worked at the Dearborn Glass Plant in 1973 and again from 1989 through 1990. They sued Defendants, manufacturers of polyvinyl butyryl ("PVB"), a material Ford purchases in bulk and uses in making automobile windshields, alleging that Defendants negligently failed to warn Ford in the safe and proper use of PVB in Ford's industrial manufacturing process. Since 1966, Ford has purchased PVB sheets from Defendants to make glass shatter-resistant. Plaintiffs claim that when PVB sheets are heated, they emit toxic fumes that have caused Plaintiffs' injuries and diseases.

Ford has purchased PVB from three different manufacturers. Monsanto has supplied Ford's Dearborn Glass Plant with PVB since approximately 1966. Monsanto manufactures PVB under the trade name "Saflex," and supplies it in the form of Saflex TG, Saflex TL, and Saflex WB. Most of the Monsanto PVB used at the glass plant is Saflex TG. The balance, used in the manufacture of automobile mirrors, is Saflex WB. Approximately 60% of all PVB used at the glass plant from 1981 through 1991 was Monsanto product. DuPont supplied another 37%, and Sekisui the remaining 3%. The trade name of duPont's PVB is "Butacite."

At room temperature, PVB is virtually inert. But as it is heated, it softens, its volatility increases, and it begins to give off chemical vapors. In order for Ford to shape the vinyl to windshields of various sizes, it must heat PVB in an oven during the processing operation, typically to a temperature of 190 to 205 degrees fahrenheit. At this temperature, PVB does not begin burning, but it does give off chemical vapors. Indeed, it was common for a haze to hang in the air in the room in which PVB was heated. A former foreman said that Ford employees for years complained of conditions in that room, and Plaintiffs said that there was a constant odor in the room and that they frequently suffered eye, nose, and throat irritation.

Defendants supplied Ford with Material Safety Data Sheets ("MSDSs") listing the chemical composition of PVB, its physical properties, potential hazards, recommendations for industrial hygiene, and other information. Ford's Environmental Occupational Toxicology Department typically received the MSDSs, analyzed and digested the information in them, and produced MSDSs to distribute internally. These internal MSDSs are required by 29 CFR § 1910.1200. The manager of the Toxicology Department, Larry Roslinski, said that his department does not rely solely on information in the manufacturer's MSDS when formulating an internal MSDS. It also relies on medical and technical literature. The format and contents of the MSDSs vary and are updated occasionally based upon new information or regulatory changes. It is the content of the MSDSs supplied to Ford that in a large part determine whether Ford was a "sophisticated user" of PVB. Beginning in 1986, the MSDSs from Monsanto and duPont provided Ford explicit warnings about the dangers of inhaling PVB fumes. From 1971 to 1986 however, the MSDSs given to Ford did not provide specific warnings on any danger of exposure to PVB fumes when heated. All MSDSs, even those prior to 1986, listed the hazardous decomposition products of PVB. But the MSDSs did not specify at what point PVB decomposes.

Ford attempted to obtain more information about PVB from Defendants on two occasions before 1986, but on both occasions Monsanto replied that there should be no problems regarding inhalation of PVB fumes so long as the precautions in the MSDSs were followed.

Defendants filed two motions for summary judgment. The first motion is directed toward Enochs and Newson and contends that Defendants are entitled to summary judgment on three grounds. First, Defendants argue that Ford is a "sophisticated user" of Defendants' material, precluding any duty on the part of Defendants to warn Ford or Ford's employees in its safe and proper use. Second, Defendants contend that Plaintiffs have not created a genuine issue of material fact that any alleged failure to warn was the proximate cause of Plaintiffs' injuries because they have produced no evidence that a warning would have prevented the alleged injury. Finally, Defendants argue that Newson's claim is barred by the statute of limitations because he knew or should have known of his disease or injury and that Defendants' products were a possible cause of that disease or injury more than three years before filing his complaint. The second motion is directed toward Plaintiff Bruno. In that motion, Defendants incorporate their first two arguments from their brief in support of the first motion for summary judgment, provide some additional facts in support of their "sophisticated user" defense, and argue that Bruno's claim is barred by the statute of limitations.

## II. Standard for summary judgment

In considering a motion for summary judgment, the court may grant the motion only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).[1] As the Supreme Court ruled in *Celotex,* "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ The court must view the allegations of the complaint in the light most favorable

to the non-moving party. *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

■ However, the mere existence of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient evidence upon which a jury could reasonably find for the non-movant. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256, 106 S.Ct. at 2514. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue' for trial." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989) (citing *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## III. Analysis

Defendants are entitled to summary judgment because Ford was a sophisticated user of PVB. Even if Ford was not a sophisticated user, Defendants are entitled to summary judgment on the claims by Plaintiffs Newson and Bruno because their claims are barred by the statute of limitations.

### A. The "sophisticated user" doctrine

■ In order to establish a prima facie case of negligent failure to warn of a known danger, the plaintiff in a product liability action must show that: (i) the defendant owed the plaintiff a duty to warn of the danger; (ii) the defendant breached that duty; (iii) the defendant's breach was the proximate and actual cause of the plaintiff's injury; and (iv) the plaintiff suffered damages as a result. *Tasca v. GTE Products*

---

1. On a motion for summary judgment in a diversity case such as this, the provisions of Federal Rule of Civil Procedure 56 control its determina-

tion. *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 459 (6th Cir.1986).

*Corp.,* 175 Mich.App. 617, 622, 438 N.W.2d 625 (1988). The issue in this case is whether Defendants owed a duty to Plaintiffs to warn of the danger. The question whether there exists a duty to warn is one of law for the court to decide. *Antcliff v. State Employees Credit Union,* 414 Mich. 624, 640, 327 N.W.2d 814 (1982). The duty to warn generally extends to all dangers associated with both intended and foreseeable uses. *Id.* at 637–38, 327 N.W.2d 814.

■ One who supplies a dangerous product to another through a third person has a duty to warn the ultimate user of the product's hazards if (i) the product is defective or dangerous; (ii) the supplier has no reason to believe the user will realize its defective or dangerous condition; and (iii) the supplier cannot reasonably rely on the purchaser/employer to warn the ultimate users of the product of the dangers. *Tasca,* 175 Mich.App. at 624, 438 N.W.2d 625 (citing 2 Restatement Torts, 2d § 388 at 300–301). Therefore, a manufacturer does not have a duty to warn the ultimate user of a product's danger if the purchaser is a "sophisticated user" of the product. *Mascarenas v. Union Carbide Corp.,* 196 Mich.App. 240, 246–48, 492 N.W.2d 512 (1992). The determination of whether a manufacturer reasonably relied on the purchaser/employer to warn the ultimate users of the product's dangers is made after balancing the following considerations: "the reliability of the employer as a conduit of necessary information about the product; the magnitude of the risk involved; and the burdens imposed on the supplier by requiring it to directly warn the ultimate users." *Tasca,* 175 Mich.App. at 624, 438 N.W.2d 625. The court is to weight the above considerations, rather than impose an absolute duty to warn, because "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." *Aetna Cas. & Surety Co. v. Ralph Wilson Plastics Co.,* 202 Mich.App. 540, 547–48, 509 N.W.2d 520 (1993) (quoting 2 Restatement Torts, 2d § 388, comment n at 308).

■ Defendants contend that they are absolved of liability because Ford is a sophisticated user of PVB. They argue that Ford is a sophisticated user of PVB for two reasons. First, Defendants contend that Ford, as a commercial manufacturer and purchaser of material in bulk, must be deemed a sophisticated user as a matter of law and that, therefore, Defendants had no duty to warn Ford or the ultimate users of the product's dangers.[2] Defendants rely upon *Aetna v. Ralph Wilson,* arguing that it holds that "[c]ommercial enterprises that use materials in bulk must be regarded as sophisticated users, as a matter of law." 202 Mich.App. at 546, 509 N.W.2d 520. It is questionable, however, whether the holding in *Ralph Wilson* goes that far. In *Ralph Wilson,* the Michigan Court of Appeals did write that "[c]ommercial enterprises that use materials in bulk must be regarded as sophisticated users, as a matter of law," 202 Mich.App. at 546, 509 N.W.2d 520, and that "[t]hose with a legal obligation to be informed concerning the hazards of materials used in manufacturing processes must be relied upon, as sophisticated users, to fulfill their legal obligations, thereby absolving manufacturers in some circumstances of the duty to warn the users of chemical products, where such use is in the course of employment for a sophisticated bulk user," *id.* at 547, 509 N.W.2d 520. But the *Ralph Wilson* court expressly found that the supplier had adequately warned the purchaser/employer of the product's dangers. *Id.* at 546, 509 N.W.2d 520. Therefore, one must extend *Ralph Wilson* considerably beyond its own factual context if one is to read it to say that a commercial enterprise that uses a material in bulk is deemed automatically a "sophisticated user" of that material, or that a supplier is always insulated from liability no matter how lacking its warnings to the enterprise, when it sells its hazardous product in bulk to a commercial enterprise. Because the premise of the "sophisticated user" doctrine is that the purchaser/employer

---

2. Plaintiffs do not quarrel with the conclusions that Ford is a commercial manufacturer and purchaser of PVB in bulk.

knows or should know of a product's dangers, *see* 2 Restatement Torts, 2d § 388, comment n at 307–310, this Court finds that Michigan courts would be unlikely to adopt a rule in which a supplier can invoke the "sophisticated user" defense regardless of what a purchaser/employer knows or should know of a product's dangers.

■ Defendants next argue that there is no genuine issue of material fact that Ford is in fact a "sophisticated user" of PVB. Defendants argue that there is no dispute that they could reasonably rely on Ford to apprise its employees of any of PVB's dangers because of the MSDS's supplied to Ford, Ford's multiple departments dedicated to industrial hygiene and research of the materials Ford uses in its manufacturing process, Ford's legal duty to inform its employees about hazardous materials they must use, and the information in the public domain on PVB's decomposition products. As discussed above, the "sophisticated user" defense is appropriate where the supplier can reasonably rely on the purchaser/employer to warn the ultimate users of the product's dangers. *Tasca*, 175 Mich.App. at 624, 438 N.W.2d 625. Such reliance is reasonable only where the purchaser/employer knows or should know of the product's dangers. The policy behind the sophisticated user doctrine is that the supplier cannot be asked to warn each ultimate user of the product's dangers; therefore, the supplier is permitted to rely on the purchaser/employer to warn the ultimate users of the product's dangers if such reliance is reasonable. *See* 2 Restatement Torts, 2d § 388, comment n at 308–310; comment o at 310. But if the purchaser/employer has not been warned of the product's dangers, either directly by the supplier or constructively by available literature in the public domain on the product's hazards, it is unreasonable, if not impossible, for a supplier to rely on the employer to warn its employees of the product's dangers. Therefore, a purchaser/employer knows or should know of a product's dangers where either (i) the supplier has provided an adequate explicit warning of such dangers, *see Ralph Wilson*, 202 Mich.App. at 536, 509 N.W.2d 520; *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct.

545, 83 L.Ed.2d 432 (1984) (and cases discussed therein); *Rusin v. Glendale Optical Co., Inc.*, 805 F.2d 650 (6th Cir.1986) (applying Michigan law); or (ii) where information on the product's dangers is available in the public domain, *see Tasca*, 175 Mich.App. at 625, 438 N.W.2d 625. The ultimate inquiry is whether the supplier or purchaser/employer is in the best position to warn the ultimate users of a product's dangers. *Id.* at 627, 438 N.W.2d 625.

Therefore, the issues here are whether Defendants' MSDSs to Ford explicitly warned Ford of the dangers of heating PVB and, if not, whether there was adequate information in the public domain about the dangers of heating PVB. The court finds that although Defendants' MSDSs and other communications to Ford did not explicitly warn Ford of the dangers of heating PVB until 1986, Ford was nevertheless a sophisticated user of PVB well before 1986 because there was adequate information in the public domain about the health hazards of PVB decomposition products, and Ford was in fact actually aware of such hazards.

Prior to 1986, no MSDS warned users of any hazard from inhaling PVB vapors. No MSDS recommended special precautions or special handling procedures. The precautionary measures that Defendants endorsed in the MSDSs were not adequate in informing Ford of any danger to its employees in inhaling PVB fumes. As late as 1984, Monsanto's MSDS for Saflex TG, the product of which Ford purchased the most, provided the following vague "OCCUPATIONAL CONTROL PROCEDURES:" "Use NIOSH approved equipment when airborne exposure is excessive. Consult respirator manufacturer to determine appropriate type of equipment for given application;" and "[p]rovide ventilation to minimize exposure. Local exhaust ventilation preferred." The MSDS also provided that "Saflex TG does not appear to possess any toxicologic properties which would require special handling other than the good industrial hygiene and safety practices employed with any industrial chemical." The only specific warning Monsanto provided in its MSDSs for Saflex TG and TL was that it "will degrade and char at temperatures

above 200 degrees celsius." Ford, however, only heated PVB to temperatures of 190 to 205 degrees fahrenheit, a temperature far below the level at which Monsanto warns that PVB will degrade and char. Because Monsanto provided no other specific warnings on most of its MSDSs, Ford could have been led to believe that heating PVB to 190 to 205 degrees fahrenheit was not dangerous.

Monsanto updated this MSDS in December, 1985. Again, it recommended "no special precaution" for ventilation or respiratory protection. It even stated that "[o]ccupational exposure to this material has not been reported to cause any significant adverse human health effects." This MSDS discussed the results of a test where rats inhaled vapors from the plasticizer used in Saflex TG where rats survived the test with no observable effects. The material was not heated for this test, however. It is the vapors from heated PVB that Plaintiffs claim their injuries. Monsanto has provided no subsequent MSDS for Saflex TG or TL.[3]

Therefore, through 1985, Defendants' MSDSs did not warn specifically of any danger associated with heating PVB at a temperature less than 200 degrees celsius. No special precautions were recommended for handling PVB, and the MSDSs even affirmatively stated that PVB exposure has not been reported to cause adverse health effects. Defendants have provided no other evidence of communication to Ford about the dangers of PVB. Therefore, Defendants did not adequately warn Ford of the dangers of heating PVB at least through 1985.

After 1985, Defendant's MSDSs specifically warned Ford of the dangers of heating PVB. Monsanto's 1986 MSDS for Saflex WB clearly states the following warning: "CAUTION! ELEVATED PROCESSING TEMPERATURES MAY CAUSE RELEASE OF TOXIC VAPORS WHICH ARE HARMFUL IF INHALED," and discusses a rat inhalation study in which five out of six

rats died when exposed to mists of Saflex WB generated at temperatures of 170 degrees celsius. In addition DuPont's MSDS for Butacite dated July, 1986, warns users that "[a]t elevated temperatures fumes are evolved which may cause respiratory distress and eye irritation." This MSDS adequately warns Ford that it should not heat Butacite to an elevated temperature—such as 190 to 205 degrees fahrenheit—without protections and precautions. Because these 1986 MSDSs adequately warned Ford of the dangers of heating two kinds of PVB, Ford should have known of the dangers of heating any kind of PVB beginning in 1986.[4]

But even if Defendants did not specifically warn Ford of the dangers of heating PVB prior to 1985, Defendants are entitled to summary judgment if there was adequate information in the public domain about the dangers of heating PVB. In Tasca, 175 Mich.App. at 625, 438 N.W.2d 625, the court held that the plaintiff's employer was a "sophisticated user" of cobalt, even though the defendant supplier did not warn of cobalt's dangers, because the defendant knew the employer had suspected for more than 40 years that cobalt was harmful when inhaled, had performed research on the nature of the harm, and had taken steps to protect employees based on that research. In this case, there is no information available in the public domain on the dangers of heating the compound PVB. Plaintiffs' experts' literature searches have revealed nothing about the hazards of PVB, and Defendants do not dispute this.

But Defendants argue that Ford could have discovered and in fact did discover the dangers of heating PVB because each MSDS lists the decomposition products of PVB, and there is literature in the public domain on the hazards of those decomposition products. Every MSDS provided to Ford lists hazardous decomposition products as "[b]utyraldehyde, butyric acid, 2-ethylbutyric acid, acro-

---

**3.** DuPont has not provided an MSDS prior to 1986. Sekisui has not provided any MSDS.

**4.** Plaintiffs contend that the 1986 MSDS for Saflex WB has not been shown by Monsanto ever to have been transmitted to Ford. Plaintiffs, however, have provided no evidence other than coun-

sel's assertion that Ford never received the 1986 Monsanto MSDS. Even if Ford never did receive the Monsanto 1986 MSDS, Ford did receive the 1986 duPont MSDS which provided adequate warnings. See below.

lein, crotonaldehyde in trace amounts, carbon monoxide when burned with limited supply of air." Further, Ford has multiple departments dedicated to industrial hygiene and research of the materials Ford uses in its manufacturing process. Ford has at its disposal three different departments that could obtain information on the effects of PVB. Ford's Toxicology Department has the responsibility and capability of investigating potential toxicological effects of the many materials Ford uses in manufacturing automobiles and has full access to several nationwide computerized chemical reporting services. Ford also has a Scientific Research Department that employs scientists and is capable of conducting tests on a wide variety of scientific issues, and whose laboratories, staff, and experts are available for other Ford departments to use. Finally, Ford has its own Industrial Hygiene Department, whose sole responsibility is to assure worker safety by testing materials that Ford uses in its particular manufacturing processes and by designing and engineering appropriate industrial hygiene safety equipment for the use of those materials. The Industrial Hygiene Department employs 18 professionals, and can also contract with outside professional hygiene consulting firms. Roger Wabeke, the former manager of the Industrial Hygiene Department, has testified that he and other professional industrial hygienists usually rely on the information shared by the manufacturer concerning hazardous chemicals. Wabeke dep. at 105–08.

Therefore, Defendants argue, Defendants could rely upon Ford to find information in the public domain on the decomposition products and then take adequate precautions. The Court agrees. Every MSDS produced by Monsanto or DuPont since 1971 lists all the decomposition products of PVB. While the MSDSs did not warn Ford that those decomposition products will present a danger when PVB is heated, every expert in this case agrees that information on the dangers of these decomposition products, especially the aldehydes, is abundantly available in the scientific literature. Moreover, Ford was aware as early as 1979 that vapors from heated PVB cause a danger to employees. A memorandum dated June 7, 1979, from a Ford Industrial Hygienist to the manager of Ford's Nashville Glass Plant is titled "Vapor Exposure from Heated Polyvinylbutyral." The memorandum reads as follows:

> As requested by Mr. J. Adkins, Senior Safety Engineer, Nashville Glass Plant, industrial hygiene evaluated the windshield interlayer repair area as a result of employee complaints of excessive vapors from heated polyvinylbutyral. Both breathing zone and general area samples were taken in the room where this operation is performed ... Qualitative and quantitative analyses were performed on these samples to determine wheat potential environmental contaminants were being produced by this process ... Bulk samples of all three colors from both suppliers, Monsanto and DuPont, were analyzed for emissions produced by heating this material.

> \*     \*     \*     \*     \*     \*

> As indicated by the attached two reports, emissions from the heated polyvinylbutyral showed a 'predominance of aldehydes (notably butyraldehyde), and a few alcohols and ketones.' ... Based on this and discussion with Mr. L. Roslinski, Ph.D. Corporate Toxicologist, it would be prudent to consider all similarly grouped compounds at least as additive in terms of their health effects on humans. Aliphatic and aromatic aldehydes, alkyl benzenes, alcohols, and ketones would all be expected to produce upper respiratory irritation along with some narcotic effects from alcohols and ketones.

> In light of the fact that there are a great number of components being produced and at least additive response is assumed, the quantities from the samples and laboratory simulated studies would indicate that control of these emissions is warranted.

This memorandum shows that Ford knew that heating PVB posed a health hazard in spite of the lack of direct manufacturer warnings, and that the heating of PVB produced the emission of aldehydes and other compounds. These are some of the same aldehydes and compounds that Monsanto and DuPont listed as decomposition products in every MSDS. Based on the information avail-

able in the public domain, Ford was a sophisticated user of PVB.

## B. Statute of Limitations

### 1. Plaintiff Newson

■ The applicable statute of limitations in a product liability action is three years. Mich.Comp.Laws Ann. § 600.5805(9) (West 1987). The limitations period "begins to run when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, a possible cause action." *Moll v. Abbott Laboratories,* 444 Mich. 1, 5, 506 N.W.2d 816 (1993). *Moll* developed a two-part test for determining when a statute of limitations period commences. The period begins to run when a plaintiff (i) knew, or should have known, based on objective facts, of a disease or injury, *id.* at 18, 506 N.W.2d 816, and (ii) is aware, or should have been aware, of a possible cause of that disease or injury, *id.* at 24, 506 N.W.2d 816. The first element is determined based on the surrounding facts and circumstances and is an objective standard. It is irrelevant whether the plaintiff in fact thought he or she had a disease or injury. *Id.* at 17–18, 506 N.W.2d 816. The second element is determined based on when the plaintiff should have been aware of a possible cause of his injury or disease, not the actual cause or even likely cause. *Id.* at 22–23, 506 N.W.2d 816.

"[I]n the absence of disputed facts, the question whether a plaintiff's cause of action is barred by the statute of limitations is a question of law to be determined by the trial judge." *Id.* at 26, 506 N.W.2d 816. While a jury is charged with resolving disputed facts, "[b]efore a jury is ever reached a preliminary decision must always be made, namely, whether or not there is anything to go to a jury." *Id.* (citations omitted).

■ Here, Plaintiff Newson filed suit on March 27, 1992. Therefore, under *Moll,* his claim is barred if he should have discovered a possible cause of action prior to March 27, 1989. Newson admits that he should have discovered a possible cause of action before that date. Newson quit work in late March, 1989 because he was coughing up blood and had difficulty walking and breathing, and testified that he had been physically incapable of working for three months preceding his departure from Ford. Newson further testified that he had breathing problems since early 1987 that he thought were caused by vinyl inhalation. Finally, Newson testified that Ford and his union representative told him in 1987 that breathing vinyl fumes is dangerous.

Nevertheless, Newson argues that there are two statute of limitations accrual dates for short- and long-term effects in chemical exposure cases. In *Larson v. Johns–Manville Corp.,* 427 Mich. 301, 399 N.W.2d 1 (1986), the Michigan Supreme Court held that the products liability statute of limitations, in the context of asbestos-related injuries, has a double trigger. The first accrual date is triggered by the development of asbestosis. The second accrual date is triggered by the development of cancer. Therefore, even though an employee may develop asbestosis and only many years later cancer, both of which are caused by asbestos, an employee's suit for the development of cancer is timely so long as it is brought within three years of the date the cancer develops, even if the employee suffered asbestosis years earlier. *Id.* at 304–05, 399 N.W.2d 1. The court reasoned that deviation from the general rule—that subsequent damages do not give rise to a new cause of action—was warranted because cancer and asbestosis are two distinct diseases that result from asbestos exposure. "It is widely accepted by the scientific community that asbestosis and cancer are not medically linked, that is, cancer is not an outgrowth or complication of asbestosis." *Id.* at 315 n. 6, 399 N.W.2d 1. The court explained that it would be unfair to require plaintiffs who suffered from asbestosis to sue also for damages from cancer when the plaintiffs had not yet developed cancer. That is because in order to recover damages on the basis of future consequences, a plaintiff must demonstrate with "reasonable certainty" that the future consequences will occur. *Id.* at 317, 399 N.W.2d 1 (citing *Prince v. Lott,* 369 Mich. 606, 609, 120 N.W.2d 780 (1963)). Plaintiffs who had brought suit within three years of the discovery of asbestosis and attempted to recover for the likelihood of developing cancer in the future would

be unable to prove with "reasonable certainty" that they would develop cancer. Therefore, a double-trigger statute of limitations period was necessary to avoid unfairness to plaintiffs and to prevent overzealous plaintiffs who suffer from asbestosis from bringing suits claiming cancer, when such plaintiffs in all likelihood would never develop cancer. *Id.* 427 Mich. at 317–18, 399 N.W.2d 1. The court concluded, however, by expressly limiting its holding to asbestos cases: "We emphasize again that the rule we develop in this case for subsequent damages is premised on the unique nature of the asbestos situation and is not applicable in other areas." *Id.* at 319–20, 399 N.W.2d 1.

Newson argues that *Larson*'s reasoning is applicable to the present case. He argues that until he quit Ford March 31, 1989, he suffered no signs of lung damage. While he apparently admits to have suffered some signs of health problems because of PVB prior to March 31, 1989, he argues that such signs were merely the short-term, transient effects of PVB exposure. Newson further argues that there is no evidence that short-term, transient effects are in any way medically-linked to the development of lung damage. Plaintiff relies upon the affidavit of its expert toxicologist, Dr. Thomas Schrager. Dr. Schrager stated that "[s]hort-term effects [of the inhalation of PVB's decomposition products] include eye, nose, and throat irritation. These effects are transient, i.e., they disappear relatively soon after exposure ceases. Long-term effects include lung tissue damage. Such damage may be permanent." Dr. Schrager further stated that "PVB inhalation exposure causes two completely different types of effects: short-term effects which are reversible and long-term effects which are irreversible. Some people can experience short-term effects without ever experiencing long-term effects." Plaintiffs' Ex. 13.

This court declines to extend *Larson* beyond the class of cases the Michigan Supreme Court expressly limited the double-trigger. The Michigan Supreme Court in *Larson* created the two accrual dates because it is widely-accepted in the scientific community that asbestosis and cancer are not medically linked. *Id.* at 315 n. 6, 399 N.W.2d 1. Plaintiff has presented the vague affidavit of Dr. Schrager stating that PVB inhalation exposure causes two different types of *effects*. But Dr. Schrager does not state that PVB inhalation causes two distinct *diseases,* as in cancer and asbestosis. Even if Dr. Schrager did state that PVB inhalation exposure causes two different diseases, this piece of evidence is a far cry from "wide acceptance in the scientific community." Therefore, Newson's claim is time barred.

### 2. Plaintiff Bruno

■ Defendants argue that Plaintiff Bruno's cause of action is time barred because he did not file suit until January 13, 1994, and that there is no genuine issue of material fact that Bruno knew of a possible cause of action before January 13, 1991.

Bruno originally sued Monsanto and duPont in state court on March 27, 1992. That case was removed to this court and eventually was dismissed without prejudice November 23, 1992. The claim against these Defendants was refiled in this court January 13, 1994. A statute of limitations is tolled while a case is pending. Mich.Comp.Laws Ann. § 600.5856(1) (West 1987); *Roberts v. City of Troy,* 170 Mich.App. 567, 581, 429 N.W.2d 206 (1988). Therefore, because the original claim was pending for 242 days, for statute of limitations purposes the present case is back-dated effectively 242 days from January 13, 1994, to May 16, 1993. Thus, Plaintiff Bruno cannot maintain his cause of action if he knew, or should have known, of a possible cause of action prior to May 16, 1990.

Bruno last worked at Ford in 1990. He was diagnosed with asthma either in "late 1990 or early 1991." Bruno's answers to first interrogatories of Monsanto, No. 21. Bruno admits that he was forced to leave work at Ford by a Ford physician "in 1989 or 1990 when I became sick from vinyl fumes." *Id.,* No. 24. He further acknowledges that he became aware of symptoms of his asthma "sometime within four to six months after I began working in the vinyl room in 1987," and that he "became aware of the symptoms as physical reactions to fumes, fire, smoke inhalation and skin irritation from exposure to conditions in the vinyl room." *Id.,* No. 22.

Therefore, Plaintiff should have known of a possible cause of action four-to-six months after he began working in the vinyl room in 1987. Plaintiff's claim is time barred because, as discussed above, the court declines to extend *Larson*'s double-trigger beyond asbestos cases.[5]

## IV. Conclusion

Therefore, based on the foregoing the court hereby GRANTS Defendants' motion for summary judgment.

---

5. Because the court grants summary judgment to Defendants on two different grounds, the court does not reach Defendants' argument that Plaintiffs have failed to produce any evidence that a warning would have prevented the alleged injury.