Bernier v. Simon-Telelect, et al.    CV-96-009-M    06/02/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Gene F. Bernier
     Plaintiff

     v.                                         Civil No. 96-9-M

Simon-Telelect, Inc. and
James A. Kiley Co.,
     Defendants


O R D E R


     Plaintiff was injured in a work-related accident involving a
truck equipped with an aerial lift.  He brought suit against
Simon Telelect, Inc., the manufacturer of the aerial lift, and
James A. Kiley, Co., the assembler of the truck.  Both defendants
have filed motions for summary judgment, and plaintiff objects.
For the reasons that follow, defendants' motions are denied.


**Standard of Review**

     Summary judgment is appropriate if the "pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The moving party first must show the absence of a genuine
issue of material fact for trial.  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 256 (1986).  Because defendants raise
affirmative defenses, on which they would have the burden at
trial, to prevail at this stage they must demonstrate the absence

of disputed material facts with respect to all elements of each asserted defense, so that no reasonable juror could find in plaintiff's favor. See Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1516-17 (1st Cir. 1991); Dole Fresh Fruit Co. v. Delaware Cold Storage, 961 F. Supp. 676, 682 (D. Del. 1997); see also State v. Soucy, 139 N.H. 349, 353 (1995) (burden of proof on affirmative defenses under New Hampshire law). The court interprets the record in the light most favorable to the nonmoving party and resolves all inferences in its favor. Saenger Organization v. Nationwide Ins. Assoc., 119 F.3d 55, 57 (1st Cir. 1997). Thus, summary judgment will be granted only if the record shows no trialworthy factual issue and if the moving party is entitled to judgment as a matter of law. EEOC v. Green, 76 F.3d 19, 23 (1st Cir. 1996).

## Background

On January 7, 1993, plaintiff, Gene Bernier, was working as a foreman for Public Service Company of New Hampshire ("PSNH") on a line crew changing insulators for high energy wires. Plaintiff was leaning against the utility truck while a lineman worked from a bucket on the truck's aerial lift above him. When the lineman repositioned himself in the aerial lift, the boom inadvertently contacted an uninsulated wire. Electricity was conducted down the lift, through the truck, and through plaintiff who suffered serious injuries.

2

The truck involved in the accident was assembled by defendant James A. Kiley Co. for PSNH in 1987. In 1986, PSNH requested quotes from Kiley to equip four line utility trucks (including the truck later involved in the accident) with aerial lifts. PSNH's specifications relating to "50' HEAVY DUTY ELBOW UNITS FOR LINE TRUCKS" (aerial lifts) called for: "First or lower section to be constructed of steel [ninety degrees] minimum articulation." PSNH did not specify provision of a lower boom insert ("LBI"), that is, a fiberglass insert on the first or lower section, for any of the four trucks.

The LBI was an option offered by defendant Simon-Telelect on its aerial lifts. Its purpose was to act as an insulator — preventing electric current from being conducted through the lift to the truck (and anyone touching the truck). Kiley informed PSNH of the availability of the LBI, and listed it as an option in its formal quote. PSNH nevertheless ordered the trucks without the LBI option. In 1986, PSNH had approximately 100 utility trucks, some with and some without LBIs. Simon-Telelect manufactured the aerial lifts used on PSNH's trucks and sold the lifts to Kiley, its authorized dealer, without LBIs.

## Discussion

Plaintiff brings claims of strict product liability, negligence, and breach of warranty against each of the defendants. Defendants move for summary judgment, asserting

3

several affirmative defenses which are primarily aimed at plaintiff's strict product liability claims.[1]  Plaintiff objects.

## A.   <u>Private Contractor/Designer Defense</u>

Under New Hampshire law, "[t]o maintain a products liability claim based on defective design, a plaintiff must prove: (1) that the design of the product created a defective condition unreasonably dangerous to the user; (2) that the condition existed when the product was sold by a seller in the business of selling such products; (3) that the use of the product was reasonably foreseeable by the manufacturer; and (4) that the condition caused injury to the user or the user's property." <u>Chellman v. Saab-Scania AB</u>, 138 N.H. 73, 77 (1993); <u>accord</u> <u>LeBlanc v. American Honda Motor Co.</u>, 141 N.H. 579, 585 (1997). Defendants point to decisions in other jurisdictions that recognize an affirmative defense against liability for a design defect when a private contractor constructs a product from plans or specifications provided by someone else.  <u>See, e.g.</u>, <u>Rogers v. Ford Motor Co.</u>, 925 F. Supp. 1413, 1420-21 (N.D. Ind. 1996)

---

[1]Defendants do not distinguish among their defenses with respect to plaintiff's three distinct claims, despite the fact that negligence and strict liability may require distinct defense theories.  <u>See, e.g.</u>, <u>Thibault v. Sears, Roebuck & Co.</u>, 118 N.H. 802, 811 (1978).  Instead, defendants generally lump plaintiff's claims as "tort liability," and cite cases without regard to whether the defenses recognized therein pertained to strict liability or negligence claims.  Because defendants urge that "At the very least, this court should grant summary judgment on strict liability," (capitalization omitted), the court understands that strict liability is the primary focus of the present motions for summary judgment.

4

(construing Indiana law). Defendants also interpret <u>Bruzga v. PMR Architects</u>, 141 N.H. 756 (1997)(where the court held that architects and builders provide professional services, not products, and so are not subject to strict liability) to forecast acceptance of the private contractor defense in New Hampshire.

Kiley and Simon-Telelect contend that they are not liable for defective design of the aerial lift because neither of them, they argue, designed the lift. Defendants point to the fact that PSNH provided specifications to Kiley that described the aerial lift to be installed on PSNH's utility trucks. They argue that they merely built the lift and assembled the truck in conformance with PSNH's specifications.

The record does not support defendants' representations. PSNH provided "standards" for "elbow units" (aerial lifts) for the purpose of obtaining proposals from companies such as Kiley to customize four utility trucks. The standards described the minimum required functions, capacities, stability, components, and controls for the aerial units on the trucks. In response, Kiley submitted its quote, dated May 13, 1986, in which it said:

> We are pleased to submit a proposal for furnishing four
> (4) Tel-E-Lect Material Handling Aerial Bucket and
> Kiley Utility Body to meet the requirements of your
> Specifications included with your Request for Quotation
> No. 1322. . . . .
> We feel that the Tel-E-Lect, Model T5051 Unit meets or
> exceeds your specifications and offer the following:
> [describes particular features of the Tel-E-Lect model with
> references to pages of PSNH's standards].

The Tel-E-Lect model Kiley described in its proposal apparently met or equaled most, but not all, of PSNH's standards. For

5

example, PSNH asked that the hydraulic system reservoir be "Mounted on line body floor at front" while the specifications for the Tel-E-Lect model provided "Reservoir mounted in turret." Kiley highlighted the differences between the Tel-E-Lect model it was quoting and PSNH's standards: "We would like to point out some of the features of the Tel-E-Lect Machine not included in your specifications" and Kiley listed eighteen items. Kiley also offered three options, with prices, including the LBIs that were not mentioned in PSNH's standards.

Defendants offer no record support for their conclusory allegations that PSNH "designed" the particular aerial lifts manufactured by Simon-Telelect and installed on the PSNH trucks. Defendants charge that PSNH "specified" and "expressly requested" aerial lifts without LBIs. PSNH's standards specify a steel boom, rather than fiberglass, but do not rule out an LBI, as is demonstrated by the fact that Kiley's proposal offered the LBI option and Kiley discussed that option with PSNH. Defendants argue, "If Simon-Telelect wanted to have an opportunity to build the aerial lift which PSNH intended to purchase in 1986, its bid had to comply with PSNH's specifications." Defendants do not include in the record submitted here any "bid" by Simon-Telelect to PSNH. Then defendants speculate, without record references, that if Simon-Telelect had submitted a "bid" or built a lift that did not comply with PSNH's requirements, PSNH would have rejected it as not complying with the specifications. Kiley's proposal, however, describes a Tel-E-Lect aerial lift model that was

6

otherwise not entirely conforming with PSNH's standards, yet still offered the LBI option.

The record evidence strongly suggests that Kiley's proposal offered PSNH a standard aerial lift model manufactured by Simon-Telelect and chosen by Kiley because it generally equaled or exceeded PSNH's standards; Kiley did not offer a unique product manufactured specially to meet PSNH's design, or even its standards exactly. In other words, Simon-Telelect offered a variety of available aerial lift models with varying specifications and options. Kiley picked Tel-E-Lect model T5051 as the unit most closely matching PSNH's requirements (standards). No custom manufacturing based on PSNH's "design" is suggested by this record. Rather, it seems that Simon-Telelect offered standard lift models and Kiley chose the T5051 model for inclusion in its quote for the entire assembly.

To prevail on a private contractor defense, defendants must show that they "took no part in the design of the allegedly defective product." Rogers, 925 F. Supp. at 1421. Defendants have not met this prerequisite based on undisputed facts in the summary judgment record. As defendants have not sustained their burden to establish a "private contractor" defense, even based on the law of jurisdictions that do recognize the defense, it is unnecessary to decide whether New Hampshire would recognize the defense. In summary, because the record evidence shows at least a material factual dispute as to whether PSNH, rather than defendants, designed the aerial lift involved in plaintiff's

7

accident, defendants cannot prevail on summary judgment on that defense theory.

**B.    Component Part Defense**

Simon-Telelect proposes that a "component part supplier is liable only if a plaintiff's injuries resulting from the use and operation of the product, is 'directly and solely attributable' to its component part, and the product manufacturer's 'only negligence lay in its failure to discover that the [product] was defective.'" Simon-Telelect's Memorandum at 8 quoting Jaswell Drill Corp. v. General Motors Corp., 129 N.H. 341, 346 (1987). In Jaswell, the court held that Jaswell Drill Corporation would be entitled to indemnity from its fellow tortfeasor, General Motors, if Jaswell's liability to the injured party was only due to "its failure to discover that the GM engine was defective." Id. Thus, New Hampshire apparently does not recognize the component-part defense asserted by Simon-Telelect — at least not in Jaswell.

Further, if New Hampshire were to recognize an affirmative defense for a component part supplier, such a defense would not seem to protect Simon-Telelect in this case, where its component part, the aerial lift, was causally connected to the accident. Based on the facts of record, this is not a case where an "innocent" component part was integrated into a dangerous product. The record here suggests that Simon-Telelect designed and offered the LBI to address the precise safety issue related

8

to the accident — suggesting that the danger was apparent long before the lift was incorporated into the utility truck and that the lift was not an "innocent" component in an otherwise defective product.

## C.    Sophisticated User Defense

Defendants also contend that the aerial lift was not unreasonably dangerous for the ordinary consumer because PSNH, the purchaser of the truck, is engaged in the electric utility industry and was well-acquainted with the dangers of working with electricity, using aerial lifts, and the safety-related purposes of an LBI.  Similarly, defendants argue that plaintiff, the user of the truck, was personally knowledgeable about the dangers of electrical work and the purpose of an LBI.  As such, defendants argue, PSNH and plaintiff were "sophisticated users" of the aerial lift, thus relieving defendants of any liability for defective design or their failure to warn of dangers associated with using the aerial lift without an LBI.

Defendants' "sophisticated user" defense derives from negligence tort liability theory pertaining to suppliers described in section 388 of the Restatement, Second, of Torts, rather than from strict tort liability theory described in section 402A.  See, e.g., Alexander v. Morning Pride Mfg. Inc., 913 F. Supp. 362, 371 (E.D. Pa. 1995) aff'd, 100 F.3d 946 (3d Cir. 1996).  Section 388(b) limits a supplier's liability to one who "has no reason to believe that those for whose use the

9

chattel is supplied will realize its dangerous condition."  Under New Hampshire law, knowledge and experience of a product's user are relevant to a defendant's negligence in failing to warn of the product's dangers.  See Laramie v. Sears, Roebuck & Co., 707 A.2d 443 (N.H. 1998); Murray v. Bullard Co., 110 N.H. 220, 226-27 (1970).  Thus, New Hampshire would seem to recognize the "sophisticated user" defense in negligence product liability actions.

While some jurisdictions have also imported the "sophisticated user" defense into strict liability actions, others have not.  Compare Baker v. Monsanto, 962 F. Supp. 1143, 1151 (S.D.Ind. 1997) (Indiana law applying section 388 in both negligence and strict liability failure to warn claims) with Alexander v. Morning Pride Mfg. Inc., 913 F. Supp. 362, 371 (E.D. Pa. 1995) (Pennsylvania law limiting section 388 to negligence claims).  In addition, variations in state law of product liability make it unclear in some cases whether a "sophisticated user" defense is being applied to strict liability or negligence claims.  See, e.g., Scallan v. Duriron Co., 11 F.3d 1249, 1252 (5th Cir. 1994) (applying product liability law of Louisiana).  Under New Hampshire's strict liability law, "[m]anufacturer liability may still attach even if the danger is obvious to a reasonable consumer or if the user employs the product in an unintended but foreseeable manner," depending on the cost and efficiency of reducing the danger of the product.  Price v. BIC Corp., 702 A.2d 330, 333 (N.H. 1997).  Because the "sophisticated

10

user" defense is a negligence theory derived from the Restatement, Second, of Torts, it is likely the New Hampshire Supreme Court would limit its application to negligence claims.

In this case, the danger posed by the aerial lift when employed in electrical utility work was that any contact between the aerial lift and electric current could energize the entire truck and electrocute anyone in contact with the truck. LBIs were intended to provide insulation, preventing electrification beyond the lift. An effective warning would notify anyone in proximity to a truck, without an LBI, to stay clear while the aerial lift operated in the vicinity of electrical energy. In fact, a written warning apparently was affixed to other PSNH utility trucks without LBIs, but was not on plaintiff's truck at the time of the accident. Defendants argue that they were not obligated to provide such warnings, nor are they liable for any danger because plaintiff himself was fully aware of the danger posed by a lift without an LBI, and alternatively, because they could reasonably rely on PSNH to provide adequate training and warnings.

1. Plaintiff as "sophisticated user."

Plaintiff testified in his deposition he was aware of the purpose of LBIs on utility trucks, had worked on trucks with and without LBIs; and, knew that the truck on the day of the accident was not equipped with an LBI. He also testified that because of the danger that the truck could be energized if the aerial boom

11

touched a live energy source, he would not touch or stand near the truck when the lift was in motion — only when the lift was in position and stationary. The warning system he and his fellow workers used required the bucket operator on the lift to yell down and tell the others before he moved the lift so that they could all stand clear. When the accident happened, the worker in the bucket moved the lift without making plaintiff aware of it and while he was touching the truck. Thus, based on the record here, despite plaintiff's understanding of the danger involved in working with aerial lifts and electrical power and his intent to avoid contact with an energized truck, the accident occurred.

Plaintiff's knowledge alone seemingly would not protect him from the danger of the truck being energized through the lift, unless plaintiff could work without ever touching or standing near the truck while the lift was in use, which appears unlikely on this record. In addition, at least the lift operator's knowledge and experience would seem to be pertinent, because the record indicates that electrical utility workers operate in teams whose members must cooperate to avoid dangers. Although the lift operator's deposition excerpt, in the record here, shows that he was familiar with the accident prevention manual, it has not been established what specific knowledge he had about the dangers of contacting an energy source with a part of the aerial lift, the purpose of LBIs, or whether he was aware at the time of the accident that the truck was not equipped with an LBI.

12

Therefore, whether plaintiff was a "sophisticated user" under these circumstances, so defendants could reasonably rely on his knowledge and experience to understand and avoid the known risk posed by the aerial lift without an LBI, is not established as an undisputed fact on the record presented here. Accordingly, defendants have not shown on the summary judgment record, that a reasonable jury could only find in their favor — that they reasonably relied on the electrical utility workers to avoid electrocution accidents when using a lift unprotected by an LBI and without warnings. See, e.g., Howard v. General Cable Corp., 674 F.2d 351, 355 (5th Cir. 1982).

2. PSNH as "sophisticated purchaser."

The supplier of a dangerous product may not be liable for providing a dangerous product, or for failing to provide a warning of the product's danger, if the supplier reasonably relied on an intermediary, such as a purchaser/employer, to make the product's use reasonably safe. See, e.g., Landberg v. Ricoh Intern., 892 F. Supp. 938, 943 (E.D. Mich. 1995); Reibold v. Simon Aerials, Inc., 859 F. Supp. 193, 200 (E.D. Va. 1994). The "sophisticated purchaser" rule is intended to apply when "the supplier cannot be asked to warn each ultimate user of the product's dangers; therefore, the supplier is permitted to rely on the purchaser/employer to warn the ultimate users of the product's dangers if such reliance is reasonable." Newson v. Monsanto Co., 869 F. Supp. 1255, 1260 (E.D. Mich. 1994).

13

Jurisdictions that apply Restatement, Second, of Torts, section 388's "sophisticated purchaser" defense determine whether a supplier's reliance was reasonable by considering factors discussed in comment n of section 388, which include:

> (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; (6) the burdens imposed on the supplier by requiring that he directly warn all users.

Baker, 962 F. Supp. at 1151; accord Burt v. Fumigation Serv. and Supply, Inc., 926 F. Supp. 624, 633 (W.D. Mich. 1996); In Re TMJ Implants Products Liability Litigation, 872 F. Supp. 1019, 1028 (D. Minn. 1995); Dole Food Co. v. North Carolina Foam Indus., 935 P.2d 876, 881 (Ariz. Ct. App 1996); Carter v. E.I. DuPont de Nemours & Co., 456 S.E.2d 661, 664 (Ga. Ct. App. 1995).

It is undisputed that Simon-Telelect's aerial lifts were available in 1986 with and without LBIs and that the option with an LBI was a safer model for use in electrical utility work. At that time, PSNH had trucks with lifts that included LBIs and some that did not. The record does not show what Simon-Telelect knew about PSNH's understanding of the LBI option, or what safety information Simon-Telelect provided to Kiley about LBIs. Although Kiley disclosed and discussed the LBI option with a PSNH representative, Kiley did not advise about safety features or performance of the LBI. The record, therefore, does not include sufficient information to support defendants' defense that they reasonably relied on PSNH to provide for the safe use of the lift

14

and the truck.  In addition, unlike problems that might arise from supplying hazardous materials or prescription medicines, where the manufacturer cannot efficiently label or protect the ultimate user, Simon-Telelect and Kiley would seem to have had ample opportunity to communicate with the ultimate users of the aerial lift and utility truck through written warnings, placards, affixed stickers, or other materials.

Based on the record presented here, defendants have not carried their burden to show that no reasonable jury could find in plaintiff's favor as to whether defendants reasonably relied on PSNH for the safe use of the lift and truck.

## Conclusion

For the foregoing reasons, defendants' motions for summary judgment (documents no. 36 and 34) are denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

June 2, 1998

cc:  Kenneth M. Brown, Esq.
     Jeffrey H. Karlin, Esq.
     William J. Thompson, Esq.
     Shaela M. Collins, Esq.