*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TIFFANY CARROLL,

        Plaintiff-Appellee,

and

KAYLA CARROLL,

        Plaintiff,

v

PROGRESSIVE MICHIGAN INSURANCE
COMPANY,

        Defendant-Appellant,

and

ALLSTATE INSURANCE COMPANY,

        Defendant-Appellee.

UNPUBLISHED
April 15, 2025
3:05 PM

No. 366626
Wayne Circuit Court
LC No. 21-012076-NF

Before: MALDONADO, P.J., and CAMERON and YOUNG, JJ.

PER CURIAM.

Defendant-appellant, Progressive Michigan Insurance Company ("Progressive") appeals by leave granted the trial court's order denying its motion for summary disposition. On appeal, Progressive argues no genuine issues of material fact remain after Michael Carroll, husband of plaintiff-appellee, Tiffany Carroll, properly opted out of personal injury protection (PIP) coverage for allowable expenses under the relevant insurance policy. We agree with Progressive and reverse and remand.

-1-

## I. FACTUAL AND PROCEDURAL HISTORY

In September 2020, Tiffany Carroll was driving her husband Michael Carroll's[1] 2007 Chevrolet Trailblazer, which was insured by Progressive. Accompanying Tiffany in the Trailblazer was her adult daughter, plaintiff Kayla Carroll, when they were struck at an intersection by a vehicle that was making a left turn in front of them. Tiffany and Kayla sustained injuries as a result. After the accident, Tiffany sought to collect PIP coverage for allowable expenses from Progressive, who denied coverage on the ground that Michael had opted out of PIP coverage for allowable expenses under the policy.

About two months prior to the accident, Michael completed an electronic application to purchase the relevant insurance policy for his Trailblazer from Progressive. Michael listed himself as the named insured, and Tiffany as an authorized driver. Their daughter, Kayla, was not listed as a driver or resident relative, and their other daughter, Dalicia, who lived with them, was listed as an "excluded driver." At this time, Tiffany was employed full-time with the Karmanos Cancer Institute, and had obtained health insurance for her family from her employer, McLaren Health Advantage. Based on Tiffany's qualified health coverage through her employer, Michael sought to opt-out of PIP coverage for allowable expenses in his application.

Michael's electronic insurance application included a four-page PIP medical-coverage selection form entitled, "MICHIGAN SELECTION OF PERSONAL INJURY PROTECTION (PIP) MEDICAL COVERAGE – INDIVIDUALS." This form was initially created by the Michigan Department of Insurance and Financial Services (DIFS) and is used by Progressive. Progressive submitted this PIP-selection Form A288 to DIFS for approval on March 3, 2020, and DIFS subsequently approved it.

This PIP-selection form directed the applicant to select one of four options by placing his or her initials on the corresponding line next to the selected option. Michael placed his initials on the line corresponding with Option 4, providing "$250,000 in PIP coverage per person per accident, with exclusions." After selecting Option 4, Michael listed himself, plaintiff, and Dalicia as persons with qualified health coverage excluded from PIP medical coverage on the policy. Michael initialed each line certifying his selections as follows:

> I have read this form. I understand the PIP medical options available to me and the benefits and risks associated with those options.
>
> I have made a coverage selection and I understand that the selection I have made applies to me and any other person claiming benefits under this policy.
>
> I understand that if I have not made a selection my policy will be issued with unlimited PIP medical coverage and I will be charged the premium for this option.
>
> I understand that if I have chosen Option 4 or Option 6, I must notify my insurer within 30 days if a person who has qualified health coverage loses their qualified

---

[1] Michael Carroll is not a party to this action.

health coverage.  A person who has not obtained qualified health coverage or PIP medical coverage within 30 days of the loss of coverage will not be entitled to any PIP medical benefits.

Directly under his certification of Option 4, under a designated area marked "APPLICANT/NAMED INSURED SIGNATURE," "DocuSigned by" and the name "MICHAEL A. CARROLL" appear along with the date "July 8, 2020."  Michael's selections were restated in various places throughout the insurance application, including at page 2, where the amount $1,747 was reflected along with an acknowledgement that was a "reduction for those who have opted out of the $250,000 PIP Medical Expense Coverage."  Michael's e-signature was on that page, as well as on page 5, where the opt-out information was again restated.

Tiffany's accident took place on September 17, 2020, about two months after Michael purchased the insurance for the Trailblazer and completed the PIP opt-out form.  On the morning of the accident, before Progressive had learned that it occurred, a Progressive agent added a "Policy Note Text" to Michael's insurance file, stating, "Important!  Proof of qualified health coverage is required to maintain current coverage limits: $250K w/ exclusions."  On the following day, while Progressive was apparently still unaware of Tiffany's accident, Progressive sent a letter to Michael asking him to "please send a statement from the health insurance company or employer that shows who's on the plan and confirm. . . .  'Qualified Health Coverage,' " warning that Progressive would "have to change [his] PIP coverage option, which will increase [his] rate" if Michael did not submit proof of the QHC to Progressive by October 8, 2020.

On September 21, 2020, Progressive sent a second declarations page to Michael, which again listed Michael, Tiffany, and Dalicia as having excluded PIP coverage for allowable expenses, showing a premium savings of $1,747, and again providing an "Outline of Coverage" revealing that no premium amount was charged to Michael for PIP coverage for allowable expenses.  On September 23, 2020, Progressive received notice of, and formally documented, Tiffany's accident.

On October 14, 2020, Progressive sent a letter to Michael informing him that, because he did not provide the requested proof of QHC, the mandatory minimum of $250,000 in PIP medical coverage was added to his policy, resulting in a premium increase of $1,757.  This updated amount was reflected in a new declarations page that was sent along with the letter.  On October 13, 2020, Progressive mailed Michael a demand for the "[r]emaining balance" of $1,474 due by November 8, 2020.  Because Progressive received neither proof of QHC, nor the increased premium payment from Michael by that date, on November 12, 2020, Progressive sent Michael a "Cancellation Notice," stating that, "Unfortunately, [it] didn't receive [his] payment and, as a result, [his] policy will be canceled at 12:01 a.m. on November 23, 2020," but that Michael could avoid cancellation by sending payment to Progressive "by check or money order" by that date.

On November 18, 2020, McLaren, Tiffany's employer, sent a letter to Tiffany confirming that she did have the requisite QHC, because her health coverage through McLaren "did not exclude automobile accidents" and had "an annual deductible of $6,000 or less per covered individual" as required by statute.  Progressive received the same letter on the same day.  Two days after receiving McLaren's letter, Progressive sent a "Final Bill" to Michael stating that it

"canceled [his] policy at [his] request, but there is still a balance due on [his] canceled policy term," and that Michael "no longer [has] insurance with [Progressive], effective September 18, 2020." Progressive also informed Michael that his expected "payment will not reinstate [his] policy." Receiving no response from Michael, Progressive sent the final bill to Michael on December 10, 2020, and, after receiving a partial payment, Progressive sent another final bill to Michael on January 6, 2021. On January 19, 2021, Progressive sent a letter to Tiffany explaining that Michael's insurance policy on the Trailblazer did not "carry coverage for allowable expenses," including "medical bills" resulting from her accident.

Tiffany filed this lawsuit seeking PIP coverage for allowable expenses for herself against Progressive.[2] Progressive moved for summary disposition under MCR 2.116(C)(10), arguing that there was no genuine issue of material fact that Michael opted out of PIP coverage for allowable expenses under MCL 500.3109a(2) for himself, Tiffany, and Dalicia, on the basis of the QHC exclusion, and that his election was confirmed by his signature and initials on the electronic application for insurance, including the PIP-selection Form A288, and two separate declarations pages. Progressive further maintained that, because it never received premium payments from Michael for PIP medical coverage, it did not assume the risk of covering those expenses, and therefore could not properly be held liable for those benefits.

Tiffany responded that Michael could not have opted out of the PIP coverage for allowable expenses at the time he purchased the policy from Progressive, because Progressive did not receive proof of the QHC until November 18, 2020, which was approximately two months after the accident occurred, and four months after Michael purchased the policy. Tiffany also attached to her motion an affidavit from Michael testifying that, although he did "purchase[] automobile insurance from [Progressive]," he "did not make any request . . . that [Tiffany] and/or [himself] opt out of PIP medical benefits at any point during the policy's inception," and "did not sign any document in which [he] agreed to opt [Tiffany] and/or [himself] out of PIP medical benefits on or before July 8, 2020, the date of the policy inception."

Progressive replied that Bulletin 2021-25-INS, issued by the Director of DIFS on May 14, 2021, "clarifies what constitutes an 'effective selection' under MCL 500.3107c(1)" and provided guidance regarding "what occurs when an individual fails to provide proof of [QHC] in connection with an exclusion under MCL 500.3109a(2)." This bulletin provides the following in relevant part:

> [A]t the time of an initial application for insurance and at each renewal, if an applicant or named insured attempts to select a limit of $250,000 for PIP medical benefits but fails to provide the requisite proof of QHC, the insurer must issue or renew the policy at the $250,000 PIP medical benefit limit without the exclusions

---

[2] Tiffany simultaneously asserted a claim for PIP coverage for allowable expenses for Kayla against the Michigan Automobile Insurance Placement Facility (MAIPF). MAIPF assigned Allstate to take responsibility for Kayla's no-fault claims. Allstate settled the matter, and the parties stipulated to dismiss Allstate from this case.

*unless the applicant or named insured thereafter provides the proof of QHC.* [Bulletin 2021-25-INS, p 92 (emphasis added).]

Progressive maintained that Tiffany, along with Michael and Dalicia, were covered by the QHC, as defined in the no-fault act, MCL 500.3101 *et seq.*, and that the proof of this QHC coverage was provided in the November 18, 2020 letter from McLaren.

The trial court began the hearing on Progressive's motion for summary disposition by asking how Progressive permitted Michael to select the PIP opt-out without first obtaining proof of his QHC. Progressive explained that the statutory reforms allowing the opt-out selection were still new at the time Michael made his selection, so a grace period was provided to allow applicants to provide such documents, and that the proof of Michael's QHC was eventually provided, albeit after the accident. Tiffany argued that dismissal should not be granted because Michael provided "a sworn affidavit saying he did not opt out of PIP," therefore creating "a genuine issue of material fact on the issue." The trial court denied Progressive's motion stating, "I think given the standard that the evidence is viewed in the light most favorable to the nonmoving party, the Court is going to give [Tiffany] the benefit of the doubt on this." Progressive moved for reconsideration, which the trial court denied. Progressive requested leave to appeal in this Court and in a 2-1 decision, this Court granted Progressive's application. *Tiffany Carroll v Progressive Mich Ins Co*, unpublished order of the Court of Appeals, entered October 26, 2023 (Docket No 366262). This appeal followed.

## II. ANALYSIS

On appeal, Progressive argues there is no genuine issue of material fact to survive summary disposition, as Michael elected to opt-out of PIP coverage for allowable expenses by: (1) validly confirming and certifying his election by entering his signature and initials in pertinent places throughout his application for insurance; (2) paying a significantly reduced monthly premium, reflecting the absence of PIP coverage for allowable expenses; (3) holding sufficient QHC under the statute; and (4) submitting no contrary evidence besides the conclusory affidavit stating that Michael did not opt-out of PIP coverage for allowable expenses. We agree.

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Cetera v Mileto*, 342 Mich App 441, 446-447; 995 NW2d 838 (2022). "When reviewing a motion brought under MCR 2.116(C)(10), 'a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties . . . in the light most favorable to the party opposing the motion.' " *Yang v Everest Mut Ins Co*, 507 Mich 314, 320; 968 NW2d 390 (2021). "Summary disposition is appropriate where no genuine issue of material fact exists." *Id.* "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id.* (quotation marks and citation omitted).

### B. RELEVANT STATUTORY PROVISIONS, NO-FAULT ACT

In 2019, MCL 500.3107c and 3107d were added to the no-fault act and MCL 500.3109a was amended to allow qualified applicants to purchase a limited amount of PIP medical coverage,

or to opt-out of purchasing PIP coverage entirely. Before the 2019 amendments, it was required that all policyholders purchase unlimited PIP medical coverage. MCL 500.3107 sets forth the scope of PIP medical coverage, including "allowable expenses." "Allowable expenses," as listed in MCL 500.3107(1)(a)(i) and (ii), refers to the medical portion of PIP benefits. MCL 500.3107c(1) states that, on an insurance application for a no-fault policy to be issued or renewed after July 1, 2020, the applicant must select one of the provided coverage levels for PIP benefits on a form approved by DIFS.

As noted, under the 2019 no-fault act reforms, an insured may now opt-out of PIP medical coverage from his or her no-fault insurer, thereby saving the cost of premium payments for such coverage, if the named insured, named insured's spouse, or any relatives of either the named insured or the spouse domiciled in the same household, have coverage for medical expenses under a qualified plan as defined by MCL 500.3107d(7)(b)(i). MCL 500.3107d provides policyholders with this option:

> (1) For an insurance policy that provides the security required under section 3101(1) and is issued or renewed after July 1, 2020, the applicant or named insured may, in a way required under section 3107e and on a form approved by the director, elect to not maintain coverage for personal protection insurance benefits payable under section 3107(1)(a) if the applicant or named insured is a qualified person, and if the applicant's or named insured's spouse and any relative of either that resides in the same household have qualified health coverage or have coverage for benefits payable under section 3107(1)(a) from an insurer that provides the security required by section 3101(1).

> (2) An applicant or named insured shall, when requesting issuance or renewal of a policy under subsection (1), provide to the insurer a document from the person that provides the qualified health coverage stating the names of all persons covered under the qualified health coverage.

Subsection (7) provides the following definition of QHC:

> (b) "Qualified health coverage" means either of the following:

> (*i*) Other health or accident coverage to which both of the following apply:

> (A) The coverage does not exclude or limit coverage for injuries related to motor vehicle accidents.

> (B) Any annual deductible for the coverage is $6,000.00 or less per individual. The director shall adjust the amount in this sub-subparagraph on July 1 of each year by the percentage change in the medical component of the Consumer Price Index for the preceding calendar year. However, the director shall not make the adjustment unless

the adjustment, or the total of the adjustment and previous unadded adjustments, is $500.00 or more.

MCL 500.3107e(2) provides that a person electing to exclude PIP medical coverage on the basis of QHC must do so in one of the following ways:

(a) Marking and signing a paper form.

(b) Giving verbal instructions, in person or telephonically, that the form be marked and signed on behalf of the person. To be an effective selection or election, the verbal instructions must be recorded and the recording maintained by the person to whom the instructions were given. If there is a dispute over the effectiveness of a selection or election under this subdivision, there is a presumption that the selection or election was not effective and the insurer has the burden of rebutting the presumption with the recording.

(c) Electronically marking the form and providing an electronic signature as provided in the uniform electronic transactions act, 2000 PA 305, MCL 450.831 to 450.849.

If the applicant fails to effectively make an opt-out selection under the statute but "a premium or premium installment has been paid, there is a rebuttable presumption that the amount of the premium or installment paid accurately reflects the level of coverage applicable to the policy . . . ." MCL 500.3107c(3).

Considering these provisions together, we now turn to their application in the instant case.

C. VALIDITY OF MICHAEL'S ELECTRONIC SIGNATURE ON THE PIP OPT-OUT FORM

In both the lower court and on appeal, Progressive highlights the validity of Michael's electronic signatures on the PIP opt-out form. Tiffany claimed, however, that Progressive failed to provide sufficient evidence proving the validity of Michael's electronic signatures on the PIP selection form.[3] We agree with Progressive that Michael's signatures on the opt-out form were valid.

MCL 500.3107c(1) states in relevant part that an insured "shall" select a coverage option "in a way required under" MCL 500.3107e. That section in turn provides:

(2) A person must make a selection under section 3009 or 3107c, or an election under section 3107d in 1 of the following ways:

(a) Marking and signing a paper form.

---

[3] References to Tiffany's claims are based on her arguments in the lower court, as she failed to file any briefing with this Court on appeal.

(b) Giving verbal instructions, in person or telephonically, that the form be marked and signed on behalf of the person. To be an effective selection or election, the verbal instructions must be recorded and the recording maintained by the person to whom the instructions were given. If there is a dispute over the effectiveness of a selection or election under this subdivision, there is a presumption that the selection or election was not effective and the insurer has the burden of rebutting the presumption with the recording.

(c) Electronically marking the form and providing an electronic signature as provided in the uniform electronic transactions act, 2000 PA 305, MCL 450.831 to 450.849.[1]

Michael used an electronic signature as we colloquially understand one in that he used a third-party software, DocuSign, and included his initials and full name throughout the application for insurance. That is also an electronic signature as contemplated by Uniform Electronic Transactions Act (UETA).[4] MCL 450.832(h) provides, " 'Electronic signature' means an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Moreover, MCL 450.839 provides:

(1) An electronic record or electronic signature is attributable to a person if it is the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable.

(2) The effect of an electronic record or electronic signature attributed to a person under subsection (1) is determined from the context and surrounding circumstances at the time of its creation, execution, or adoption, including any agreements of the parties, and otherwise as provided by law.

The UETA defines "security procedure" as "a procedure employed for the purpose of verifying that an electronic signature, record, or performance is that of a specific person or for detecting changes or errors in the information in an electronic record." MCL 450.832(n).

As mentioned, Progressive's electronic application uses DocuSign software. When signing a document with this software, each signature creates a DocuSign number, and a certificate of

---

[4] Given the UETA compliance of this contract, these documents are categorically different than those analyzed by this Court in *Bronson Health Care Group, Inc v Esurance Prop and Cas Ins Co*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 363486). In *Bronson*, this Court ultimately concluded that the insured's signature was simply "an electronically printed name and date," with no proof that it was attributable to the insured, and thus that it was "insufficient to establish that Russell electronically signed the PIP selection form in accordance with the UETA." *Id. at* ___; slip op at 8. This Court remanded the case "for further discovery" in order "to make sense of" the "IT metadata showing IP addresses" to determine "what the evidence establishes, if anything." *Id. at* ___; slip op at 9. Here, the trial court was presented with the metadata and additional information beyond a single electronically printed name and date.

completion is generated to show the DocuSign number, the IP address, a signature timestamp, and an electronic record ID number. Michael's application contained language that read, "[b]y electing to review and sign your documents electronically, you agree to be bound by them. If you do not agree with any of these terms and conditions, you must not sign your documents electronically." According to the application, "By checking the 'I agree to the Terms and Conditions for Reviewing and Signing Electronic Documents' box," Michael consented to "electronically review and sign the documents," acknowledged that he was "the person whose name appears on the documents presented," and that he would "carefully review each document before applying [his] electronic signature." Under the terms of the application, Michael acknowledged that his electronic signature had the same legal effect as his written signature on a paper version of the document," and that his electronic signature is valid evidence of his intent to enter an agreement with Progressive and is legally binding.

Michael's signatures and initials on the opt-out form complied with the UETA. The UETA, under MCL 450.837, provides:

> (1) A record or signature shall not be denied legal effect or enforceability solely because it is in electronic form.

> (2) A contract shall not be denied legal effect or enforceability solely because an electronic record was used in its formation.

> (3) If a law requires a record to be in writing, an electronic record satisfies the law.

> (4) If a law requires a signature, an electronic signature satisfies the law.

MCL 500.3107e(2)(c) specifically permits an insured to select PIP medical coverage under MCL 500.3107c using the UETA. Michael agreed to the use of an electronic signature on the insurance application and the PIP-coverage selection form, using the DocuSign secured electronic signature software. The application stated that, "[b]y electing to review and sign [his] documents electronically," Michael agreed to be bound by the "Terms and Conditions for Reviewing and Signing Electronic Documents," including:

> • You represent that you are the person whose name appears on the documents presented to you and that you will carefully review each document before applying your electronic signature; and

> • By applying your signature to the documents in this signing session, you are electronically signing the document, which has the same legal effect as your written signature on a paper version of the document. Your electronic signature is valid evidence of your intent to enter an agreement with us and is legally binding.

The DocuSign secured-signature software Progressive and Michael used provides time stamps indicating when Michael was sent the application, when he viewed it, and when he signed it. It also indicates the security level used as "Email, Account Authentication." Michael's

DocuSign signature appears four times and his initials appear five times on the application and PIP-selection form, confirming his choices to opt-out of PIP coverage.

### 1. MICHAEL'S LOWER PREMIUM PAYMENTS ARE FURTHER EVIDENCE OF THE VALIDITY OF THE E-SIGNED CONTRACT

We note briefly here that neither party contests that from the inception of the contract until sometime after the accident, Michael paid a monthly premium that reflected the absence of PIP coverage. Progressive did not charge, and Michael did not pay, a premium for PIP coverage.

This is in keeping with our conclusion that Michael made an effective selection of PIP coverage with the UETA-compliant e-signed contract.[5] The record before us reveals that Michael elected to exclude PIP coverage for allowable expenses on the basis of having QHC, and that he benefited from this election as shown on his application where it states that his insurance premiums totaled $416 for a six-month period, reflecting a "[p]remium reduction" of $1,747 for opting out of PIP coverage. Again, it is undisputed that Michael did not pay, and Progressive did not receive, any premium payment for PIP coverage for allowable expenses. This is, as Progressive stated in its pleadings in this Court, the exact way the reform encompassed by MCL 500.3107c was intended to work.

### 2. MICHAEL'S AFFIDAVIT DOES NOT CREATE A QUESTION OF FACT AS TO THE VALIDITY OF THE E-SIGNED CONTRACT

Seemingly to rebut this documentary evidence, Tiffany presented an affidavit from Michael in the trial court. The one-page affidavit states, in relevant part, that Michael "did not sign any document in which [he] agreed to opt Tiffany Carroll and/or [himself] out of PIP medical benefits on or before the date of July 8, 2020, the date of the policy inception." The affidavit also attests that Michael was not asked for proof of qualifying health coverage until after the September

---

[5] In addition to its ruling on the electronic signature issue, *Bronson* further clarified that the premium amounts an insured has paid may create a rebuttable presumption regarding the corresponding amount of PIP coverage the insured elected:

> MCL 500.3107c(3) does, in fact, apply, because its three preconditions are satisfied—(1) defendant issued Russell a policy, (2) for purposes of this analysis, it can be assumed that Russell did not make an effective selection of PIP coverage, and (3) Russell made a premium payment to defendant. Thus, "there is a rebuttable presumption that the amount of the premium or installment paid accurately reflects the level of coverage applicable to the policy under subsection (1)." MCL 500.3107c(3). [*Id.* at ___; slip op at 12.]

This rebuttable presumption only applies where an individual *did not make an effective selection of PIP coverage* which is not the case before us. But that does not mean the payments are irrelevant. They are further evidence of the bargained-for exchange indicated in the contract.

17, 2020 motor vehicle accident. The affidavit does not contest that Michael paid lower premiums in the months before Tiffany's accident that were in keeping with his selection on the application. The affidavit likewise does not contest the legitimacy of the e-signed application—like that Michael's signature was forged or procured under duress, that he did not understand what he was signing, or that he did not read the insurance application or PIP-selection form. Michael's affidavit does not create a question of fact as to the validity of his opt-out.

Affidavits and other documentary evidence may be filed to defeat a dispositive motion under MCR 2.116(C)(10). Such affidavits "must be made on the basis of personal knowledge and must set forth with particularity such facts as would be admissible as evidence to establish or deny the grounds stated in the motion." *SSC Assoc Ltd Partnership v Gen Retirement Sys*, 192 Mich App 360, 364; 480 NW2d 275 (1991). However, "[s]ummary disposition cannot be avoided by conclusory assertions that are at odds either with prior sworn testimony of a party or . . . actual historical conduct of a party." *Aetna Cas & Surety Co v Ralph Wilson Plastics Co*, 202 Mich App 540, 548; 509 NW2d 520 (1993); see also *Holland v Kraatz*, unpublished per curiam opinion of the Court of Appeals, issued March 13, 2018 (Docket No. 336808), p 5 ("Plaintiff's self-serving affidavit alone is not sufficient to create a genuine issue of fact where there is signed and dated documentary evidence that directly contradicts the averments in the affidavit.").[6]

As supplied above, the form completed by Michael meets all the statutory requirements under the UETA and the no-fault act. Michael's conclusory denial did not set forth with particularity any specific facts to establish a genuine issue of material fact whether Michael did in fact electronically sign and initial the insurance application and PIP-selection form. Further, Michael's historical conduct contradicts the substance of the affidavit. He paid a lower premium for the months preceding the accident, exhibiting behavior in accordance with the selections made through his statutorily-valid e-signatures. Summary disposition cannot be avoided with this conclusory statement contrary to Michael's historical conduct and signed documentary evidence in the form of his repeated signatures and initials throughout the insurance documents. Michael's affidavit did not create any genuine issues of material fact sufficient to defeat summary disposition. To hold otherwise would cut against "the most fundamental rule of Michigan insurance jurisprudence" that "an insurer can never be held liable for a risk that it did not assume and for which it did not charge or receive any premium." *Dunn v Detroit Auto Inter-Ins Exch*, 254 Mich App 256, 270; 657 NW2d 153 (2002).

This maxim should, and for all intents and purposes does, resolve this case. We acknowledge though, another question remains—what happens, as here, when an insurer does not receive proof of the requisite qualified health coverage for an otherwise effective opt-out until after an accident?

---

[6] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Kennard v Liberty Mut Ins Co*, 341 Mich App 47, 53 n 2; 988 NW2d 797 (2022) (quotation marks and citation omitted).

## D. FAILURE TO TIMELY SUBMIT QUALIFIED HEALTH COVERAGE

In the lower court, Tiffany argued that Michael could not have elected to opt-out of PIP coverage for allowable expenses pursuant to the QHC exclusion because he failed to provide Progressive with proof of QHC at the time he filled out the electronic application and PIP-selection form or before the accident occurred. Progressive asserts on appeal that the opt-out was valid, notwithstanding its failure to timely verify Michael's QHC. We decline to invalidate an otherwise valid opt-out because of a four-month delay in obtaining QHC that was valid at the policy inception and all relevant times thereafter.

For applicants seeking to opt-out of PIP coverage for allowable expenses, the no-fault act requires the applicant submit proof of QHC. Specifically, the statute provides:

> (2) An applicant or named insured shall, when requesting issuance or renewal of a policy under subsection (1), provide to the insurer a document from the person that provides the qualified health coverage stating the names of all persons covered under the qualified health coverage. [MCL 500.3107d.]

The statute suggests that it is the responsibility of the applicant to provide QHC to the insurer. It fails to specify any consequences for a failure to timely provide QHC. The statute does provide a 30-day grace period for individuals with respect to qualifying health coverage, but that is limited to individuals who had qualifying health coverage that was later terminated. MCL 500.3109a(d)(i) allows 30 days for the insured to obtain new qualifying health coverage. If an accident occurs within that window, "the person is entitled to claim benefits under the assigned claims plan." MCL 500.3109a(d)(ii). This does not apply to Michael because he and his insured family members had qualifying health coverage both at the time of signing the contract with Progressive and still at the time of the accident. Progressive had not yet collected proof of that coverage, but it was in place and existed.

Seeking guidance from DIFS, we find that DIFS Bulletin 2021-25-INS (May 14, 2021), states:

> If an applicant or named insured has made an "effective selection" under MCL 500.3107c(1), but seeks an exclusion under MCL 500.3109a(2) for any or all eligible household members and then fails to provide the requisite proof of QHC for any or all household members to qualify for the exclusion, the insurer must issue a policy with $250,000 in PIP medical benefits for any or all household members that fail to provide the requisite proof of QHC; and must provide the exclusion to any or all household members that provide proof of QHC.

This process is exactly what Progressive did. When its insured failed to provide proof of QHC, it sent letters requesting the same. When proof still was not forthcoming, Progressive increased the premiums to reflect a policy with $250,000 in PIP medical benefits for the insured and all household members. There is nothing in the DIFS bulletin as to when an insurer "must issue a policy with $250,000 in PIP medical benefits for any or all household members that fail to provide the requisite proof of QHC," and that is for good reason. The statute is silent on that point.

We hesitate to read terms into a statute where the text is silent on a particular issue. See *Bronson*, ___ Mich App at ___; slip op at 6 ("It is an elementary rule of statutory interpretation that courts cannot and should not add requirements to the statute that are not found there.") (internal quotation marks and citation omitted). To the extent that the no-fault act sought to include guidance or penalties to an insured for failing to provide QHC at the time of application or renewal of a policy, or the insurer for failing to collect proof of the same within a particular time period, it is up to the Legislature, and not this Court, to specify such terms. *People v Gardner*, 482 Mich 41, 58–60; 753 NW2d 78, 89 (2008) ("sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its words, not from its silence. . . . The Legislature is fully capable of amending statutory language if it sees fit to do so.") (citations omitted).

## III. CONCLUSION

We find that Michael properly opted out of PIP coverage for allowable expenses and thus, Tiffany is not entitled to coverage under his policy with Progressive. Michael's electronic signatures were valid, Michael received the benefit of his bargain by paying lower premium payments, and his affidavit failed to create a genuine issue of material fact.

Reversed and remanded. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Thomas C. Cameron
/s/ Adrienne N. Young